*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

TERENCE DAVID LEAVY and BEVERLY LOUIS
BIGGS-LEAVY,

UNPUBLISHED
July 20, 2023

Plaintiffs-Appellants,

v

No. 363501
Genesee Circuit Court
LC No. 21-115466-NI

VINSON FLOYD CARTER and HANOVER
INSURANCE GROUP, INC., doing business as
CITIZENS INSURANCE COMPANY OF THE
MIDWEST,

Defendants-Appellees.

Before: CAMERON, P.J., and BORRELLO and O'BRIEN, JJ.

PER CURIAM.

Plaintiffs, Terrence David Leavy and Beverly Louis Biggs-Leavy, appeal as of right a stipulated order dismissing plaintiffs' claim against the remaining defendant, the Hanover Insurance Group, doing business as Citizens Insurance Company of the Midwest (Citizens). On appeal, however, plaintiffs challenge the trial court's earlier order granting summary disposition in favor of defendant, Vinson Carter. For the reasons explained in this opinion, we affirm.

## I. BACKGROUND

Plaintiffs were involved in a motor vehicle accident with Carter on March 23, 2019. The accident occurred after Carter made an illegal turn out of a parking lot and hit a vehicle, which caused that vehicle to hit plaintiffs' vehicle. Although neither plaintiff went to the hospital immediately following the accident, both sought medical treatment two days later.

## A. PLAINTIFF LEAVY

Leavy went to Hurley Medical Center's emergency room on March 25, 2019, with complaints of neck pain, ankle pain, and back pain. The report from his visit noted some tenderness in Leavy's lumbar spine and ankle, but everything else appeared normal.

-1-

Leavy next visited Hamilton Community Health Network on April 1, 2019. The notes from this visit reflect that Leavy complained of low-back pain and ankle pain, but no physical manifestations of the pain were found.

On April 4, 2019, Leavy visited Greater Flint Imaging to have images taken of his lumbar. His clinical condition was noted as "[l]ow back pain." The images revealed several "degenerative" conditions of the spine, but no fractures or other conditions. On the same day, images were taken of Leavy's ankle, which showed "mild soft tissue swelling about the left ankle," but no fracture or dislocation.

On April 27, 2019, Leavy visited the emergency room a second time complaining of pain. The report from this visit noted that Leavy was previously treated following the accident and the x-rays were negative, but Leavy was "still having pain." Additional x-rays were taken that revealed Leavy had a "[h]ealing fracture deformity" of one of his toes ("the left 4th toe").

A report from Leavy's physical therapist dated May 7, 2019, noted that Leavy partially met most of his goals for physical therapy, though it noted that Leavy was not complying with his home exercise program. The partially met goals included improving "Trunk ROM," improving posture, and improving lumbar tightness and tenderness. The therapist assessment from this visit stated:

> Terence David Leavy has improved in terms of strength, ROM and function, but still has impairments in the areas detailed in the chart above that decrease his overall functional capacity, dec quality of life, and make performing ADLs difficult with increased discomfort, fatigue. Patient continues to have elevated pain levels, that have not seemed to subside.

The plan/recommendation from this visit stated that Leavy intended to speak with Biggs-Leavy about whether Leavy should continue with the physical therapy.

Dr. Erica Hammond performed a physical therapy evaluation of Leavy on November 27, 2019. The evaluation stated that Leavy began experiencing back and toe pain immediately following the March 2019 accident, and that the pain got "progressively worse since then." Leavy was eventually discharged from physical therapy with Dr. Hammond on January 6, 2020, "due to lack of progress."

On August 12, 2021, Leavy visited with his primary care physician, Dr. Benjamin Busulto. The notes from this visit stated that Leavy presented with knee pain, that it was a recent issue, and that it was giving him trouble walking. He reported falling at home "on a couple occasions." On September 29, 2021, Leavy had a virtual visit with Dr. Busulto. The notes from this visit stated that Leavy continued to report "severe knee pain" that was worse when walking.

At his deposition in this case, Leavy testified that, following the accident, he continued working the same job he had before the accident. Leavy testified that, before the accident, he worked at Menard's as a "stock person" for about five and a half hours per day, six days per week. He said that he continued working in the same position with the same hours for roughly a year after the accident—Leavy stopped working in February 2020. According to Leavy, he planned to retire when he "was 65 or 66," but retired earlier because his "back was hurting and [he] couldn't

do the job anymore." Leavy testified that his job as a stock person required him to be on his feet the entire time. He said he never had to call into work following the accident, but he nevertheless had to retire early because the pain in his back was "too bad" to continue working. Leavy confirmed that a doctor never told him that he should not work, but he nevertheless retired early because of the pain.

Leavy further testified that, following the accident, he needed help with things like walking, showering, and getting to the toilet, but he could not recall who helped him with that. When asked whether he still needed help using the restroom and cleaning around the house, Leavy repeatedly testified that he could not remember. Leavy testified that he used to enjoy walking before the accident, but he now has "trouble walking." He explained that he could "barely walk" because his "knees go out." Further, Leavy answered "yes" when asked whether there had been a change in his sex-life. Likewise, when asked whether it was a change in "[f]requency," he said "yes." He said that the problems with his back and knee caused the change in his sex life.

## B.  PLAINTIFF BIGGS-LEAVY

Biggs-Leavy testified that, before the March 2019 accident, she was in a motor vehicle accident in the 1990s in which she suffered a debilitating back injury. She previously worked as a cook, but was not able to do that following her back injury. She was receiving social security disability for this injury at the time of the accident. She treated this prior injury with her primary care physician, Dr. Elmahdi Saeed.

The record confirms that, shortly before the Mach 23, 2019 accident, Biggs-Leavy visited Dr. Saeed on March 14, 2019, "for medication refill." The report from this visit reflected that Biggs-Leavy had a large number of medical conditions that required treatment through a wide variety of medication. As relevant to this case, the clinical notes from this visit reflect that Biggs-Leavy "has history of chronic back pain and severe neuropathy." The report specified that Biggs-Leavy suffered from "[c]hronic low back pain." It also noted that Biggs-Leavy had "[f]oot pain."

Biggs-Leavy testified that, two days after the March 23 accident, she went to the emergency room with back pain. Biggs-Leavy testified that her "back has always hurt," but the accident made it worse.

An emergency room report confirms that Biggs-Leavy visited the Hurley Medical Center emergency room on March 25, 2019. Biggs-Leavy reported to the emergency room with complaints of pain "everywhere" from a motor vehicle crash two days earlier. Biggs-Leavy told doctors at this visit that, following the accident, she began experiencing pain in both hips and her lower back, but no bruising or other visible signs of injury were reported. A physical exam was performed at this visit, and the results noted tenderness in Biggs-Leavy's hips and lower back.

Biggs-Leavy visited Dr. Saeed again on April 2, 2019. The chief complaint at this visit was related to Biggs-Leavy's recent hospitalization on March 30-31 due to "fluid overload." Biggs-Leavy also complained of leg swelling, foot pain, and "body aches secondary to" the motor vehicle accident from March 23. The physical exam notes from the visit stated that Biggs-Leavy's back "exhibits tenderness," and that "[t]enderness" was "found" in both knees.

Biggs-Leavy saw Dr. Saeed again on April 15, 2019. At this visit, her primary complaint was "of bruise and pain in her right heel," but she said she "still feels sore since her MVC on 03/23/19." In the "Review of Symptoms" portion of the report, it noted that Biggs-Leavy was negative for back pain.

Biggs-Leavy went to an initial evaluation for physical therapy on April 29, 2019. Biggs-Leavy told the physical therapist, Jennifer Wichterman, that she had an increase in back pain and right hip pain following the March 2019 motor vehicle accident. Wichterman assessed Biggs-Leavy with "significant inflammation and decreased ROM in lumbar spine," and created a plan of care to assist Biggs-Leavy in alleviating the pain.

Biggs-Leavy saw Dr. Saeed again on December 2, 2019. At this visit, Biggs-Leavy was still complaining of "chronic lower back pain." The physical exam from this visit noted tenderness, bony tenderness, swelling, and decreased range of motion for Biggs-Leavy's lumbar back.

A letter from one of Biggs-Leavy's treatment providers, Dr. Nasser Sabbagh, of Flint Neurological Centre, dated December 30, 2019, states that Biggs-Leavy was sent there "by Pain Management" because she was "[s]till having back and neck pain," as well as problems with her right arm. Dr. Sabbagh opined that an MRI of Biggs-Leavy's lumbar spine "showed no new changes from MRI done in 2015 with multilevel spondylotic changes with moderate foraminal stenosis at the left L4-L5 and bilateral L3-L4 with disk bulging." Dr. Sabbagh further opined that "[i]t does not seem that [Biggs-Leavy] has a new pathology following the motor vehicle accident early this year," and that her current problems were likely related to previous conditions.

An independent medical examination (IME) report was generated for Citizens that is dated February 14, 2020. The author of this report, Dr. Shlomo S. Mandel, noted that Biggs-Leavy's chief complaint was back pain, but stated that she had a history of chronic back pain dating back to a motor vehicle accident in the 1990s. After reviewing Biggs-Leavy's history, her past medical records, and performing a physical exam, Dr. Mandel opined that Biggs-Leavy's x-rays and MRI "show evidence of chronic advanced degeneration throughout the lumbar spine," and her physical exam revealed a "limited range of motion with reflect slowing." Dr. Mandel further opined that "[t]reatment is no longer reasonable and necessary in connection with the motor vehicle accident which as indicated likely produced soft tissue sprain/strain which typically resolves within a four to six-week period."

At her deposition, Biggs-Leavy testified that she was not under any doctor-imposed restrictions for her accident-related complaints. She further testified, however, that after the accident, she had a hard time bathing herself because it was hard to get in and out due to the pain in her back. She said that her husband and daughter used to help her, but after the accident, only her daughter helped her because her husband's "back is messed up." Biggs-Leavy testified that she needed this assistance for roughly three months after the accident. Biggs-Leavy also testified that she used to dance at a "[s]enior citizen place" before the accident, but she cannot do that anymore after the accident. She additionally said that she can no longer stand for long periods of time to cook. Biggs-Leavy further testified that her pain is so bad that she can no longer walk in the store with a shopping cart, but needs "an Amigo" to assist her. She testified that if the store does not have "an Amigo," she just goes home because she "can't walk through a store."

## C. PROCEDURAL HISTORY

Plaintiffs filed their complaint on April 27, 2021. As relevant to this appeal, plaintiffs alleged one count of negligence against Carter, and one count of loss of consortium against Carter.

On May 20, 2022, Carter moved for summary disposition, arguing that plaintiffs could not produce sufficient evidence demonstrating that either one suffered a threshold injury. According to Carter, plaintiffs could not establish a threshold injury for two reasons. First, according to Carter, plaintiffs failed to produce any evidence showing an objectively manifested impairment. Carter explained that, despite attending multiple examinations and undergoing a number of tests, none of plaintiffs' medical records reflected an objectively manifested impairment beyond subjective reports of pain. Second, according to Carter, plaintiffs failed to produce any evidence showing that their ability to lead normal lives was affected by their alleged impairments.

Plaintiffs filed their response on July 7, 2022, arguing that each of them suffered a threshold injury. For Leavy, plaintiffs argued that he had an objectively manifested impairment in his back, as demonstrated by a clinical examination that revealed tenderness in his lumbar spine, and a May 7, 2019 discharge note that stated Leavy had a "decrease in his overall functional capacity." He also had an injury to his foot and ankle, as demonstrated by the fracture to his toe that made walking more difficult. For Biggs-Leavy, plaintiffs argued that she had an objectively manifested impairment to her hips and back, as demonstrated by the March 25, 2019 emergency room report that noted "diffuse tenderness" in those areas. Her primary care physician, Dr. Saeed, likewise noted that Biggs-Leavy was experiencing pain in her lower back, and he referred to her Dr. Sabbagh. Plaintiffs further argued that it was uncontested that the injuries to their backs constituted an impairment of an important body function. Finally, plaintiffs argued that both their impairments affected their abilities to lead normal lives. For Leavy, plaintiffs argued that he needed help using the bathroom, he could no longer enjoy his hobby of walking, and the frequency with which he had sex was diminished. For Biggs-Leavy, plaintiffs argued that she needed assistance using the restroom and bathing, she could no longer dance at the "[s]enior citizens place" like she used to, she could no longer stand for long periods of time to cook, and she could no longer go to the store without assistance.

The trial court held a hearing on Carter's motion on July 11, 2022. After listening to the parties' arguments, the trial court issued a ruling from the bench. For Leavy, the trial court ruled that any impairment he suffered did not affect his ability to lead his normal life because he continued to work—where he had to stand on his feet all day—the same hours that he did before the accident. For Biggs-Leavy, the court ruled that nothing in the record affected her ability to lead her normal life "because she was already disabled" before the accident. The court also ruled that there was no "objective manifestation of something in addition" to her previous impairments. The court explained that Biggs-Leavy needed to produce evidence that her conditions were "made worse by [the] vehicle accident," which she failed to do. Accordingly, the court granted summary disposition in favor of Carter against both plaintiffs.

On October 4, 2022, Citizens and plaintiffs stipulated to dismiss the case with prejudice. This appeal followed.

## II. STANDARD OF REVIEW

A trial court's decision to grant or deny summary disposition is reviewed de novo. *Neal v Wilkes*, 470 Mich 661, 664; 685 NW2d 648 (2004). Carter moved for summary disposition under MCR 2.116(C)(10). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, in the light most favorable to the party opposing the motion." *Id*. at 119-120. A motion for summary disposition under MCR 2.116(C)(10) is properly granted when a claim presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bazzi v Sentinel Ins Co*, 502 Mich 390, 398; 919 NW2d 20 (2018). "A genuine issue of material fact exists when the record, drawing all reasonable inferences in favor of the nonmoving party, leaves open an issue on which reasonable minds could differ." *Campbell v Kovich*, 273 Mich App 227, 229; 731 NW2d 112 (2006).

The initial burden in a motion under MCR 2.116(C)(10) rests with the moving party, who can satisfy its burden by either (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (quotation marks and citation omitted). In response to a properly supported motion under MCR 2.116(C)(10), the nonmoving party cannot "rest on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial." *Campbell*, 273 Mich App at 229.

## III. ANALYSIS

The no-fault act, MCL 500.3101 *et seq*., creates threshold requirements to impose tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle. Specifically, MCL 500.3131(1) provides, "A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." At issue here is whether plaintiffs suffered a serious impairment of a body function. MCL 500.3131(5) provides:

> (5) As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:
>
> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant,

there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

The parties do not dispute the second factor. The trial court concluded that the third requirement was not met for either plaintiff, and, for Biggs-Leavy, the trial court also concluded that the first requirement (that the impairment be objectively manifested) was not met. We will address the trial court's ruling with respect to each plaintiff individually.

## A. PLAINTIFF BIGGS-LEAVY

In their initial brief on appeal, plaintiffs do not address the trial court's ruling that plaintiffs failed to produce sufficient evidence to create a question of fact as to whether Biggs-Leavy's impairment was objectively manifested. Plaintiffs' brief on appeal states only, "In this case, there [are] a number of reports which were attached as exhibits in which Plaintiffs' impairments are related through professional observation/perception." It is unclear, however, which records plaintiffs are referring to. It is plaintiffs' responsibility to establish the facts that create a genuine issue for trial; it is not this Court's responsibility to scour the lower court record to support plaintiffs' assertions. See *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 377; 775 NW2d 618 (2009). A party's failure to properly brief an issue on appeal is tantamount to abandoning it. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Accordingly, we hold that plaintiffs abandoned the issue on appeal. While this is not relevant to the trial court's ruling with respect to Leavy, this provides an independent basis to affirm the trial court's ruling with respect to Biggs-Leavy.[1]

Even if we substantively considered the issue, we would conclude that the trial court did not err by concluding that plaintiffs failed to produce sufficient evidence to create a question of fact whether Biggs-Leavy's impairment was objectively manifested. "[U]nder the plain language of the statute, the proper inquiry is whether the *impairment* is objectively manifested, not the *injury* or its symptoms." *McCormick v Carrier*, 487 Mich 180, 197; 795 NW2d 517 (2010). "Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested." *Patrick v Turkelson*, 322 Mich App 595, 607; 913 NW2d 369 (2018). Medical testimony is generally, but not necessarily, required to show an objectively manifested impairment. *McCormick*, 487 Mich at 198. The existence of a preexisting condition does not preclude recovery if the plaintiff establishes that the accident worsened the condition or its symptoms. *Wilkinson v Lee*, 463 Mich 388, 395; 617 NW2d 305 (2000); *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009).

---

[1] While, in their reply brief, plaintiffs addressed whether their injuries were objectively manifested, "raising an issue for the first time in a reply brief is not sufficient to present the issue for appeal." *Blazer Foods, Inc v Rest Properties, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003).

It is undisputed that, prior to the March 2019 motor vehicle accident, Biggs-Leavy was in a motor vehicle accident in the 1990s that left her with debilitating chronic back pain. Due to this pain, she was no longer able to work as a cook, and began collecting disability benefits. She also testified that she needed assistance using the restroom prior to the March 2019 accident. She testified that, following the March 2019 accident, the back pain she was experiencing got worse.

In the trial court, however, Carter produced evidence establishing that there was no objective manifestation of Biggs-Leavy's worsened impairment. Carter submitted the emergency room report from two days after the accident which showed Biggs-Leavy complaining of pain in her back, but the doctors only noted tenderness. When the pain persisted, Biggs-Leavy was treated by Dr. Sabbagh, who took images of Biggs-Leavy's back. Dr. Sabbagh opined that the new MRI of Biggs-Leavy's lumbar spine "showed no new changes from [an] MRI done in 2015 . . . ." Dr. Sabbagh further opined that "[i]t does not seem that [Biggs-Leavy] has a new pathology following the motor vehicle accident early this year," and that her current problems were likely related to previous conditions. These results were later confirmed by the IME conducted by Dr. Mandel, who opined that Biggs-Leavy was no longer suffering from any lingering effects from the March 2019 motor vehicle accident. This evidence sufficiently established that Biggs-Leavy's allegedly worsened impairment following the March 2019 evidence was not objectively manifested. In response, plaintiffs did not point to any evidence establishing that any of her preexisting conditions worsened as a result of the March 2019 accident. Rather, she only pointed to her subjective complaints of pain, which is insufficient to establish an objectively manifested impairment. See *Patrick*, 322 Mich App at 607. Accordingly, if we were to substantively consider this issue, we would conclude that the trial court did not err by granting Carter's motion for summary disposition as to Biggs-Leavy's claim.

## B.  PLAINTIFF LEAVY

Turning to Leavy, the trial court concluded that he failed to establish a question of fact with respect to whether his impairment affected his general ability to lead his normal life. Our Supreme Court has emphasized that "the statute merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed." *McCormick*, 487 Mich at 202. Further, the statute makes clear that the impairment must have "an influence on some of the person's capacity to live in his or her normal manner of living." MCL 500.3131(5)(c). "[T]here is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *McCormick*, 487 Mich at 203. In order to determine whether a plaintiff's general ability to lead his or her normal life has been affected, courts "compare the plaintiff's life before and after the incident." *Patrick*, 322 Mich App at 614.

In the trial court, Carter contended that Leavy's impairment did not affect his general ability to lead his normal life based largely on the fact that Leavy continued to work at Menard's following the accident. Leavy testified that he worked at Menard's as a "stock person" for about five and a half hours per day, six days per week. Leavy's position required him to be on his feet the entire time. Despite this, he said that he never had to call into work following the accident, and he continued working for almost a year after the accident—until February 2020. Moreover, despite seeing numerous doctors following the accident, no doctor ever issued any restrictions for Leavy, such as work restrictions. This evidence was sufficient to establish that Leavy's

impairment did not affect his general ability to lead his normal life, shifting the burden to plaintiffs to establish that a question of fact exists as to this issue. See *Quinto*, 451 Mich at 362.

On appeal, plaintiffs argue that Leavy's impairment affected his general ability to lead his normal life because (1) he used to walk as a hobby before the accident, but he can no longer do that, (2) he needed assistance using the bathroom following the accident, and (3) his impairment has affected the frequency with which he has sex.

With respect to the first point, Leavy testified that he had problems walking because his "knees go out." Yet Leavy's medical records immediately following the accident do not suggest that he was having any problems with his knees. Rather, Leavy reported problems with his back, neck, and ankle. The first instance in which Leavy complained of knee pain was on August 12, 2021. This was over two years after the accident at issue, and plaintiffs have not identified any evidence suggesting that Leavy's knee pain was caused by the accident from two years prior.

Relatedly, Leavy testified that he needed assistance using the bathroom because he had trouble walking. Again, however, Leavy testified that his trouble walking was related to his knee pain, which he first complained of in August 2021. There is nothing in the record connecting Leavy's knee pain to the March 2019 accident.

Finally, with respect to the changes to Leavy's sex life, the only testimony he offered was as follows:

> *Q.* Has this accident caused the change in your sex life with your wife?
>
> *A.* Yes.
>
> *Q.* Is it—what's changed? Is it—exactly what changed? Frequency?
>
> *A.* Yes.
>
> *Q.* What is it about the accident that caused the problem for you to have sex? Is there a pain anywhere?
>
> *A.* Yes, my back. My back and my knee.

When viewing this evidence in the light most favorable to plaintiffs, it is not enough to establish a genuine issue of material fact whether Leavy's impairment affected his ability to lead his normal life. The testimony amounts to mere conclusory statements devoid of detail, which is insufficient to create a question of fact. See *Quinto*, 451 Mich at 362. Moreover, as explained, to determine whether Leavy's impairment affected his ability to lead his normal life, courts "compare the plaintiff's life before and after the incident." *Patrick*, 322 Mich App at 614. All that can be gleaned from Leavy's testimony is that the "[f]requency" with which he has sex following the accident changed. Without evidence that allows the factfinder to actually compare Leavy's sex life before and after the accident, there is simply not enough in this record to create a jury-triable issue about whether Leavy's impairment affected his general ability to live his normal life.

Accordingly, we agree with the trial court that plaintiffs failed to produce sufficient evidence to create a question of fact whether Leavy's impairment affected his general ability to lead his normal life. It was therefore proper to grant Carter's motion for summary disposition.

Affirmed.

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien